United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RHONDEE L. MULLINS,<br><br>        Plaintiff,<br><br>   v.<br><br>JO ANNE B. BARNHART,<br><br>        Defendant.<br>_____/ | No. C-05-3931 JCS<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND AFFIRMING DECISION OF COMMISSIONER [Docket Nos. 12, 13]** |

## I.   INTRODUCTION

Plaintiff, Rhondee Mullins, filed a complaint on September 28, 2005, seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability benefits under Title II of the Social Security Act. In her summary judgment motion, Plaintiff asks the Court to reverse the Commissioner's decision and award benefits, or, in the alternative, for an order remanding the matter for further administrative proceedings. The Commissioner, in turn, has filed a cross-motion for summary judgment seeking an order affirming its final decision. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

For the reasons stated below, the Court denies Plaintiff's motion, grants the Commissioner's motion, and affirms the decision of the Commissioner.

//

//

**II.    BACKGROUND**

    **A.    Facts**

        **1.    Age, Education and Work Experience**

Plaintiff was born November 18, 1962, and was 40 years old on her alleged onset date of May 24, 2003. Administrative Record ("AR") at 53. She completed tenth grade in 1979. AR at 67. Sometime later she obtained a high school equivalency degree ("GED"). AR at 246. Between 1994 and 1997, Plaintiff worked full-time as an office manager in a law office. AR at 63. In 1997 and 1998, she worked full-time as a legal technician. AR at 63. Beginning in 1999, Plaintiff began to work as a court clerk. AR at 63. In 2001, she had a "physical and mental breakdown" and took some time off from her job, then returned to work part-time. AR at 251. Plaintiff worked part-time as a court clerk until May 24, 2003, the alleged onset date of disability. AR at 252,

On August 21, 2004, and continuing through the date of the hearing, Plaintiff resumed working part-time for the court. AR 257-259. At the hearing before the Administrative Law Judge ("ALJ"), Plaintiff explained that when her family leave was almost exhausted, her employer called her to ask what it would take to get her to come back to work. AR at 257. Plaintiff told her employer that she "just didn't feel that [she] could work out in the public and down – with all the stress down at the courthouse but I could possibly do telecommuting." AR at 257. In response, Plaintiff's employer arranged for Plaintiff to pick her work up at the courthouse four days a week and bring it home. AR at 257. Plaintiff explained that she picked up work one day and brought the completed work back the next day. AR at 258.

        **2.    Medical Condition and Treatment**

Plaintiff alleges that she is disabled on the basis of the following diagnosed conditions: 1) bipolar II disorder; 2) post-traumatic stress disorder ("PTSD"); 3) attention deficit hyperactivity disorder ("ADHD"); and 4) chronic pain disorder. The evidence in the record relating to these conditions is summarized below.

            **a.    Dr. Zena Potash (Treating Psychiatrist as of September 2002)**

Dr. Potash began treating Plaintiff in September 2002, seeing Plaintiff on a monthly basis for medication management. AR at 100. In a Mental Disorder Questionnaire Form dated August 27,

2003, Dr. Potash stated that she had treated Plaintiff as an outpatient for bipolar disorder II for eleven years. AR at 100. She described Plaintiff as having suffered from "rapidly cycling moods for years." AR at 100. In particular, Plaintiff cycles between "hypomanic irritable" moods that "last weeks" and "depressed moods" that last for months. AR at 100. According to Dr. Potash, Plaintiff had been seeing the same therapist, Sharlene Speights, for five years. AR at 100. Dr. Potash stated that during the year that she had been treating Plaintiff, Plaintiff had always been cooperative and compliant. AR at 100. At the same time, Dr. Potash stated that Plaintiff "always appear[ed] agitated either by overwhelming depression or irritability and a sense of urgency of needing some mental relief." AR at 102. Dr. Potash further stated that Plaintiff "always appeared overwhelmed." AR at 102.

With respect to Plaintiff's ability to concentrate and complete tasks, Dr. Potash stated that Plaintiff was "always hyper and driven wanting to do more than is probably realistic and has somewhat of a manic quality to her grandiose ambitions." AR at 103. She continued, "[i]t appears that she can't focus on tasks at home or at work." AR at 103. Dr. Potash prescribed for Plaintiff Tradazone, Seroquel, Buspar, Klonopin, Strattera and Zyprexa. AR at 104.

        **b.**   **Dr. Diane Van Arsdale (Treating Psychologist as of August 2003)**

As of August 2003, Plaintiff switched to Kaiser health insurance and began receiving mental health treatment from Dr. Van Arsdale. Dr. Van Arsdale described Plaintiff's childhood as "chaotic." Plaintiff was abandoned by her mother when she was three years old, then returned to live with her mother when her father died, less than a year later. AR at 203. Plaintiff's mother gave her marijuana and Plaintiff used it daily by the time she was five years old. AR at 203. Plaintiff was molested as a child by her half-brother and witnessed two murders. AR at 203.

Dr. Van Arsdale diagnosed Plaintiff with bipolar disorder I, ADHD, PTSD, depression and chronic pain. AR at 205. She noted that Plaintiff's attention and concentration were "poor to fair" and that Plaintiff had a "poor memory." AR at 204. Plaintiff's treatment plan encompassed individual therapy, ongoing medication evaluation, and group therapy for individuals with bipolar disorder. AR at 205. Although not all of the dates on the treatment records are legible, it appears Plaintiff saw Dr. Van Arsdale approximately once a month between August 2003 and September 2004. During this time, Dr. Van Arsdale described Plaintiff's moods variously as "depressed" (AR

3

at 144), "anxious, less depressed," (AR at 146), "depressed, sad, subdued," (AR at 150), "subdued, sad" (AR at 157), and on one visit, "manic euphoria" (AR at 169).

For each visit, Dr. Van Arsdale assigned Plaintiff a Global Assessment of Functioning ("GAF") score.[1] These scores usually were in the range of 55 to 60, indicating "moderate" functional limitations. AR at 145, 151, 158, 163, 170, 180. On one visit, on August 5, 2004, Dr. Van Arsdal assigned a GAF of 61, indicating "mild" symptoms and limitations. AR at 147.

In a form entitled Medical Assessment of Ability to do Work-Related Activities (Mental), dated October 13, 2004 ("the October 13, 2004 Mental Assessment"), Dr. Van Arsdale indicated that Plaintiff's abilities to "[d]eal with work stresses" and to "[m]aintain attention and concentration" was in the range of "fair" to "poor to none." AR at 207. She explained, "Ms. Mullins is a highly emotionally fragile 41 [year old] woman who appears at times to be more stable than she actually is. [Patient's] depression, emotional instability, fatigue, poor concentration, poor sleep, [and] extreme vulnerability to stress make working extremely difficult for her. [Patient] is at high risk for emotional breakdown." AR at 207. Later in the form, Dr. Van Arsdale wrote, "[Patient's] poor concentration, memory problems, and emotional instability, and fatigue will limit her ability to adjust to a job." AR at 208.

### c.   Sharlene Speights, L.M.F.T. (Psychotherapist as of July 1999)

Plaintiff began weekly sessions with therapist Sharlene Speights in July 1999. In a Mental Disorder Questionnaire Form dated August 13, 2003, Speights states that Plaintiff uses three calendars and has someone call her the day before and just prior to her appointments with Speights because of Plaintiff's "poor short term memory." AR at 93 - 97. She describes Plaintiff as "manic,"

---

[1] The Global Assessment of Functioning Scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." On the scale, a score of 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting")." A score of 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning." A score of 61-70 is described as "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Diagnostic and Statistical Manual of Mental Disorders* (4th Ed. Text Revision 2000) at 34.

United States District Court
For the Northern District of California

with moods ranging from "racing thoughts [and] high energy" to "depression, anxiousness low energy." AR at 93. She notes that Plaintiff has "poor short term memory [and] poor concentration." AR at 93. In describing Plaintiff's intellectual functioning, Speight writes, "short term memory [is] impaired resulting in forgetting appointments or leaving car keys out at restaurant lot. Concentration is most difficult at [increased] anxiety times. Judgment can be impaired by mood. No formal thought disorder." AR at 94. She wrote that "[o]f late she has experienced a decrease in her [adaptation] to job stresses and personal changes." AR at 96. Speights diagnosed Plaintiff with bipolar disorder II and PTSD. AR at 97. She described Plaintiff's prognosis as "guarded." AR at 97.

### d. Group therapy

Between February 11, 2004 and July 21, 2004, Plaintiff attended a regular group therapy session for individuals with bipolar disorder. AR at 148,152, 154, 155, 156159, 160.

### e. Medication

When Plaintiff moved to Kaiser, in August 2003, Carolyn Knight, N.P., took on her medication management. AR at 205. On her first visit, Knight increased Plaintiff's dose of Neorontin, started her on Depakote and continued her on Strattera and Ziprexa. AR at 196. On October 21, 2003, Knight again increased Plaintiff's dose of Neorontin and also increased her dose of Depakote from 250 milligrams to 1000 milligrams a day. In March 2004, Knight again increased Plaintiff's Depakote dose and started Plaintiff on Abilify.[2] AR at 167.

### f. Dr. Sharon Bass (Examining Psychologist – September 4, 2003)

On September 4, 2003, psychologist Sharon R. Bass examined Plaintiff at the request of the state agency handling the claim, Disability Determination Services ("DDS"). Bass completed a detailed psychological evaluation of Plaintiff. *See* AR at 106-109. She described Plaintiff as follows:

> Rhondee Mullins is a 40-year-old married female who presents with symptoms of depression and anxiety and a history of cycling through

---

[2] Because the copies in the Administrative Record of several of Knight's reports are illegible, it is unclear whether Plaintiff's medications were increased or changed during the interim period.

> depressed and elevated mood states. She has a severe trauma history that includes witness to multiple murders, incest and familial domestic violence. The claimant is of average intelligence with intact memory and concentration, though it appears her ability to concentrate and comprehend directions can be compromised when she is under significant stress. Pace and persistence on tasks is unimpaired. Her ability to adhere to a standard work routine may be moderately diminished by her vulnerability to psychological decompensation under stress.

AR at 109.

### g. Consulting Physicians

The Administrative Record includes recommendations by DDS physicians who reviewed Plaintiff's records but did not examine her. A Dr. Lucila completed a Mental Residual Functional Capacity Assessment, dated September 17, 2003, in which he or she indicated that Plaintiff had a "moderately limited" ability "to understand and remember detailed instructions" and to "carry our detailed instructions." AR at 110. Dr. Lucila indicated no other limitations, however, concluding that Plaintiff had no significant limitations with respect to performing within a schedule, sustaining an ordinary routine and working in coordination and proximity to others. AR at 110. In the section in which the consulting physician was asked to elaborate on these findings, and in particular, to be "especially careful to explain conclusions that differ from those of treating medical sources or from the individual's allegations" there is no written explanation. AR at 112. Instead, there is a notation "RW Consult." AR at 112.

The Administrative Record also includes an opinion from another DDS physician, apparently a Dr. Hansell, dated September 18, 2003. In the section entitled "Credibility of Claimant's Allegations & Symptoms," Dr. Hansell writes: "partially credible based on hx, eval & ce/mer." AR at 115. The heading entitled "Conflict or Inconsistencies" was left blank, as was the section entitled "Weighing of Opinion Evidence." Under the heading "Recommendations, Conclusions and Subsequent Notes," Dr. Hansell wrote as follows:

> 09/18/03 PSYCH MC NOTE: PTSD 3000 CYCLOTHYMIC DO 2960 DXS AS CITED ABOVE. CLAIMANT IS COGNITIVELY INTACT AND PSYCHOSIS [sic]. ABILITY TO MAINTAIN PACE AND PERSISTENCE NOTED AS INTACT, AND CLAIMANT CAN RELATE APPROPRIATELY. SHE SHOULD BE ABLE TO PERFORM SIMPLE WORK. DVLUCI.

6

AR at 115. The form is not signed or dated.

Dr. Lucila also completed a form entitled "Psychiatric Review Technique." AR at 120. That form concluded that Plaintiff's impairments do not meet any of the listings that would qualify her for disability and that an assessment of Residual Functional Capacity is necessary. AR at 120. The form indicated that Plaintiff suffers from "affective disorders," "anxiety-related disorders" and "substance addiction disorders." AR at 120. On the page listing functional limitations, Dr. Lucila indicated the following limitations: 1) "Restriction of Activities of Daily Living": Mild; 2) "Difficulties in Maintaining Social Functioning": Mild; 3) "Difficulties in Maintaining Concentration, Persistence or Pace": Moderate. AR at 129.

In January 2004, another DDS doctor, Dr. Peskin, reviewed the record. AR at 133-134. The headings entitled "Credibility of Claimant's Allegations and Symptoms," "Conflict or Inconsistencies," and "Weighing of Opinion Evidence" were left blank. AR at 134. Under the "Recommendations, Conclusions and Subsequent Notes," Dr. Peskin wrote as follws:

> 1/16/04 psych cl assessed on priro [sic] as having "cyclothmia" along with a DA/A history but assessed in [sic] 9/03 as able to do RRT and the ADL's support this on this recon she says she has not seen a Dr since that 9.03 assessment and there is no new medical evidnece [sic] to chance the prior assessment which I have affrimed [sic].

AR at 134.[3]

### B.     The ALJ's Five-Step Analysis and Findings of Fact

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in

---

[3] The Court presumes that the 9/03 assessment referred to by Dr. Peskin is the report of Sharon Bass. *See* AR at 106-109.

the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proof in establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If she is, the Commissioner finds that the claimant is not disabled, and the evaluation stops. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied at this step. If it is determined that the impairments are severe, the Commissioner will next perform Step Three of the analysis, comparing the medical severity of the claimant's impairments to a compiled listing of impairments that the Commissioner has ratified as disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled. Otherwise, the Commissioner proceeds to Step Four and considers whether the claimant, in light of his impairments and residual functional capacity ("RFC"), can still perform work she has performed in the past. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still perform previous work, she is found not to be disabled. If the claimant cannot perform past relevant work, the Commissioner performs the fifth and final step of the analysis. 20 C.F.R. § 404.1520(a)(4)(v). At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of her impairments, age, education, and work experience, can adjust to other work in the national economy. *See Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995). A claimant who is found able to make the adjustment to other work is not considered disabled, and will not receive disability benefits. 20 C.F.R. § 404.1520(f).

1       On October 27, 2004, a hearing was held before Administrative Law Judge ("ALJ") Earl J.
2  Waits. Vocational Expert Gerald Belchik appeared and submitted a Summary of Past Relevant
3  Work indicating that Plaintiff's past work was considered "skilled," with a "sedentary exertional
4  level." AR at 91. Belchik did not testify at the hearing. AR at 243-261.
5       At Step One, the ALJ in this case found that Plaintiff went back to work on August 20, 2004,
6  and therefore did not satisfy Step One for the period after that date.[4] AR at 19. The ALJ proceeded
7  to step Two for the period May 24, 2003 (the onset date) through August 19, 2004, during which
8  Plaintiff did not engage in any substantial gainful activity. AR at 19.
9       At Step Two, he found that Plaintiff suffered from anxiety and bipolar disorder-depression.
10 AR at 19. The ALJ concluded that Plaintiff's combination of impairments was "severe." AR at 19.
11      At Step Three, the ALJ found that Plaintiff's impairments did not meet or equal any listed
12 impairment which is considered conclusively disabling. AR at 19.
13      At Step Four, the ALJ considered Plaintiff's RFC. He concluded that for the period May 24,
14 2003 through August 19, 2004, Plaintiff's RFC was "at the sedentary exertional level with no other
15 physical limitations." AR at 23. He further concluded that Plaintiff's mental impairments during the
16 same period resulted in "mild limitations in activities of daily living; mild difficulties in maintaining
17 social functioning and moderate difficulties in maintaining concentration, persistence or pace." AR
18 at 23. Based on these limitations, he concluded that Plaintiff was capable of unskilled, entry level
19 work. AR at 23. In reaching this conclusion, the ALJ considered Plaintiff's medical history. He
20 gave "little weight to the findings of claimant's treating physicians because their assessments, or
21 lack of, were conclusory and based primarily on subjective complaints." AR at 22. He specifically
22 rejected the October 13, 2004 Mental Assessment of Dr. Van Arsdale on the basis that it was
23 inconsistent with the fact that Plaintiff had recently returned to work and was, at the time of the
24 assessment, doing "rather skilled work." AR at 22. According to the ALJ, the fact that Plaintiff was
25 able to pick up her work, pace herself and return her work contradicted Van Arsdale's assesment.

---

[4] In her Motion, Plaintiff does not challenge this determination.

9

AR at 22.  On the other hand, the ALJ gave "controlling weight" to the opinions of Dr. Bass and the DDS medical consultants.  AR at 23.

At Step Five, the ALJ relied on Medical-Vocational Rule 201.25, Appendix 2, Subpart P, Regulation No. 4 ("the Grids") to conclude that Plaintiff was not disabled.  AR at 26.

**C.     The Motions**

Plaintiff asserts that the ALJ erred in denying benefits on two grounds.  First, she asserts that at Step Four, the ALJ improperly weighed the opinions of Plaintiff's treating physicians, especially Dr. Van Arsdale, choosing to reject the opinions of her treating physicians in favor of the opinion of examining psychologist Sharon Bass without providing specific and legitimate reasons supported by substantial evidence.  Second, Plaintiff asserts that the ALJ's reliance on the Grids at Step Five of the analysis to show that there are jobs in significant number in the national economy that Plaintiff can perform was incorrect.  In particular, Plaintiff asserts that reliance on the Grids in cases involving exertional and nonexertional impairments is not proper unless the Grids accurately and completely describe the claimant's abilities and limitations.  Because the Grids do not take into account Plaintiff's impairment as to her ability to maintain concentration, persistence and pace, Plaintiff asserts, the ALJ has not met his burden at Step Five.

In its Opposition/Cross Motion, the Commissioner asserts that the ALJ's rejection of Dr. Van Arsdale's opinion, as well as the opinions of her treating physicians in general, was supported by substantial evidence.  In support of the ALJ's rejection of Dr. Van Arsdale's opinion, the Commissioner asserts that the ALJ's offered a legitimate reason for rejecting it, namely, that at the time Dr. Van Arsdale expressed the opinion that Plaintiff 's "ability to deal with work stresses" was in the range of "fair" to "poor to none," Plaintiff had already returned to work and was performing fairly skilled work.  The Commissioner also asserts that ALJ properly rejected the opinions of Plaintiff's treating physicians generally on the basis that that were conclusory and based only on Plaintiff's subjective complaints.  The Commissioner argues that the ALJ's reliance on the Grids was proper because Plaintiff's mental condition only limited her to performing unskilled work.

**III.   ANALYSIS**

   **A.     Legal Standard**

10

When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and "supported by substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence means "more than a mere scintilla" but "less than a preponderance." *Id.*; *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when using the evidence to reach a decision. *Benitez. v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

### B.     Rejection of Treating Physician Opinions

In developing the RFC at Step Four, the ALJ must consider limitations imposed by all of the claimant's impairments, even those that are not severe. SSR 96-8p; *see also Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005). Although the ALJ may consider many sources, the opinion of a treating physician normally is given special weight. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). If the ALJ decides to disregard the treating physician's opinions, he "must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). The Court concludes that the ALJ provided specific, legitimate reasons, supported by substantial evidence, in rejecting the opinions of Dr. Van Arsdale.

Dr. Van Arsdale is a psychiatrist who, at the time she completed the October 13, 2004 Mental Assessment, had been treating Plaintiff on a regular basis for over a year. She expressed the opinion that Plaintiff's ability to "[d]eal with work stresses" was somewhere between "fair" and "poor to none." AR at 207. She concluded that Plaintiff's ability to "maintain attention and concentration" was in the same range. AR at 207. The ALJ rejected these opinions as "inconsistent and not well supported by the evidence of record." AR at 22. In support of this position, the ALJ relied primarily on the fact Plaintiff had returned to work in August 2004 – two months *before* Dr.

11

Van Arsdale opined that Plaintiff was unable to deal with workplace stresses – and performed "rather skilled work" for the court. The ALJ also found the opinion's of Plaintiff's treating physicians to be "conclusory." *Id*.

On the other hand, the ALJ gave "controlling weight" to the opinion of Dr. Bass. AR at 23. Dr. Bass opined that although Plaintiff's "ability to concentrate and comprehend directions can be compromised when she is under significant stress" her "[p]ace and persistence on tasks is unimpaired." AR at 109. She concluded that Plaintiff's "ability to adhere to a standard work routine" would be only "moderately diminished by her vulnerability to psychological decompensation under stress." *Id*.

The Court finds the reasons given by the ALJ for rejecting Dr. VanArsdale's opinion to be specific and legitimate. First, at the time that Dr. Van Arsdale expressed the opinion that Plaintiff had virtually no ability to handle workplace stress, she was already back at work. It was therefore reasonable for the ALJ to question whether Plaintiff suffered from the degree of impairment described by Dr. Van Arsdale. Second, the opinion of Dr. Bass is based on extensive testing, whereas Dr. Van Arsdale's opinions are much more conclusory. For the same reasons, the ALJ's decision to reject the other treating physicians' opinions was based on a legitimate reason.[5] Therefore, the Court concludes that the ALJ's decision to reject the treating physicians' opinions is supported by substantial evidence.

### C.     Use of the Grids at Step Five

Under some circumstances, it may be appropriate for the ALJ to rely on the Grids to determine at Step Five whether there are "other jobs that exist in substantial numbers in the national economy" that the claimant can perform. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). In particular, the ALJ may rely on the Grids if they "accurately and completely describe a claimant's impairments." *Id*.

---

[5] Indeed, it is not clear from the record that the other treating physicians' opinions are inconsistent with the degree of impairment found by the ALJ.

12

Here, the ALJ concluded that Plaintiff could perform unskilled work. The mental demands of unskilled work include:

> the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.

SR 85-15. The Court finds that this determination was supported by substantial evidence. Accordingly, the ALJ did not err in relying on the Grids to determine that Plaintiff was not disabled.

## IV.   CONCLUSION

Plaintiff's motion is DENIED. Defendant's motion is GRANTED. The decision of the Commissioner is affirmed.

IT IS SO ORDERED.

Dated: August 14, 2006

_____
JOSEPH C. SPERO
United States Magistrate Judge